Lawrence M. Paul and Isabelle Paul v. Commissioner.
Paul v. Commissioner
Docket No. 288-69.
United States Tax Court
T.C. Memo 1970-87; 1970 Tax Ct. Memo LEXIS 271; 29 T.C.M. (CCH) 411; T.C.M. (RIA) 70087; April 20, 1970, Filed. Bart A. Brown, Jr., and Donald C. Alexander, 12th Floor Central Trust Tower, Cincinnati, Ohio, for the petitioners. Rodney G. Haworth, for the respondent. RAUM
Memorandum Findings of Fact and Opinion RAUM, Judge: The Commissioner determined a deficiency in income tax against petitioners, husband and wife, for 1962 in the amount of $7,896. The only issue remaining is whether the husband ("petitioner") received dividend income by reason of his purchase of 650 shares of stock of Sealtron Corporation on April 2, 1962, at $10 a share from his wholly owned corporation, Sealtron Electronics, Inc. The Commissioner determined that the stock purchased had a fair market value of $40 a share and that the difference represented a taxable distribution under section 301, I.R.C. 1954. He thus charged petitioners with additional *272 income in the amount of $19,500 in respect of this transaction. The parties have agreed that there were sufficient earnings and profits to support a dividend in that amount, but are in disagreement as to whether the stock purchased had a fair market value in excess of $10 a share. The sole question is thus one of valuation. The parties have filed a stipulation of facts which is incorporated herein by this reference. Petitioners were residents of Cincinnati, Ohio, during the taxable year as well as at the time the petition herein was filed. Sealtron Corporation ("Sealtron") was incorporated as an Ohio corporation on August 5, 1953. Of its 4,000 shares of authorized stock, only 3,074 shares were issued and outstanding during the years involved in this case. Three thousand shares were issued to petitioner, and 74 shares (in varying amounts) were issued to four persons who were active in its affairs, primarily salesmen. Sealtron was engaged in the business of manufacturing and selling refrigeration seals and hermetic seals. Petitioner paid $30,000 for his 3,000 shares. On July 31, 1954, petitioner contributed his 3,000 shares of Sealtron to Sealtron Electronics, Inc. ("Electronics"), *273 which was formerly known as Knight Construction Company. As a result, Sealtron became a substantially wholly owned subsidiary of Electronics. Petitioner was a builder and subdivider of property. Until about a year or so prior to the April, 1962, transaction here in question petitioner was not active in the affairs of Sealtron, apart from keeping in touch with its activities from time to time. Electronics was incorporated as an Ohio corporation on April 14, 1954. Its authorized capital stock consisted of 250 shares of no par value common stock having a stated value of $24 a share. Petitioner was originally issued 125 of these shares and the remaining 125 shares were issued to a person named John Sayre. There were no changes in ownership of these shares through November 30, 1961. When petitioner contributed his 3,000 shares of Sealtron to Electronics, Sayre matched that contribution by giving a note for $30,000 to Electronics, and that note was paid as part of the transaction whereby Sayre terminated his connection with Electronics on December 1, 1961. On that date, Electronics redeemed Sayre's 125 shares for a total consideration of $78,976. After December 1, 1961, only petitioner's *274 125 shares of Electronics were outstanding. Prior to its fiscal year ended March 31, 1961, Electronics was engaged in the construction business. During that fiscal year it abandoned that business. At the time Electronics redeemed Sayre's stock its principal assets consisted of the 3,000 shares of Sealtron and a receivable in the amount of $269,565 from Sealtron in respect of funds actually advanced to Sealtron plus accrued interest. Sayre had been active in Sealtron's affairs, and appears to have been thoroughly familiar with its operations and financial condition. At the time that petitioner and Sayre came to a parting of the ways, petitioner offered in the alternative to "buy out" Sayre or to sell his own interest to Sayre at a price that would be $10,000 less than the amount that would be paid to Sayre if Sayre sold his interest. Sayre chose to sell. At that time, Sealtron had abandoned its manufacture of refrigeration seals and was manufacturing only hermetic seals. It had neither patents nor trade secrets, and it was being threatened with patent litigation. It had a "negative net worth", and apart from one year, it had no earnings of consequence over a period of some six years. *275 In July, 1962, petitioner purchased 20 shares of Sealtron from one of the minority stockholders, a salesman, for $200, and in 413 September 1964 he purchased 39 shares from another minority stockholder, also a salesman, for $390. The stocks of Sealtron and Electronics have never been registered or publicly traded. Sealtron's operations from 1955 through March 31, 1962, resulted in substantial losses in some years, but showed strong gains in 1962, attributable to a considerable extent to a non-recurring item in that year. On April 2, 1962, petitioner purchased 650 shares of Sealtron from Electronics for $6,500. A principal purpose of that purchase was to "break" the affiliation between Electronics and Sealtron. There were no circumstances or events occurring between December 1, 1961, when Sayre's Electronics stock was redeemed, and April 2, 1962, which would affect the fair market value of the stock of either Electronics or Sealtron. The trial herein was devoted largely to the testimony of three valuation experts, two for the Government, and one for the petitioner. It would serve no useful purpose to review that evidence. Although the testimony of the Government's experts *276 was appealing from a theoretical point of view, we have concluded that petitioners' evidence was more realistic, and we hereby find as a fact that the 650 shares of Sealtron stock purchased by petitioner did not have a fair market value in excess of $6,500. In making this finding we have given considerable weight to the price at which Sayre actually sold his 50 percent interest in Electronics, whose principal assets consisted of the 3,000 shares of Sealtron and the $269,565 receivable from Sealtron. The locked-in character of the 650 shares of this privately controlled corporation and the price at which Sayre sold his Electronics stock are, we think, far more reliable guides to the fair market value of the shares here in issue than the theoretical considerations upon which the conclusions of the Government's witnesses were based. Decision will be entered under Rule 50.